**John Gregory LEE, Petitioner–Appellee,**

**v.**

**C. MARSHALL, Warden; Attorney General of the State of California, Respondents–Appellants.**

No. 94–55169.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 1994.

Decided Dec. 19, 1994.

Sharon Wooden Richard, Deputy Atty. Gen., Los Angeles, CA, for respondents-appellants.

Elsa Leyva, Los Angeles, CA, for petitioner-appellee.

Before: FLETCHER, and FERNANDEZ, Circuit Judges, and SEDWICK,* District Judge.

PER CURIAM:

C. Marshall, Warden of the California State Department of Corrections, and the Attorney General of the State of California appeal the district court's issuance of the 28 U.S.C. § 2254 *habeas corpus* writ for California state prisoner John Gregory Lee, who was convicted in state court of conspiracy to commit murder in 1982. The district court, in *Lee v. Marshall*, 843 F.Supp. 608 (C.D.Cal. 1993), found that the presence of two police officers in the jury room during jury deliberations without knowledge of the trial judge was a "structural defect," requiring automatic reversal of Lee's conviction, rather than a "trial error," which requires a *habeas* petitioner to show "actual prejudice." We conclude that the district court's issuance of the writ was in error and reverse.

## I.

In 1982, John Gregory Lee and Joe Valentine were tried on charges of murder and conspiracy to commit murder in violation of California Penal Code §§ 182, 187. During the jury deliberations, two police officers dressed in plain clothes, officers Bumpus and Jacobs, were observed by co-defense counsel exiting the jury room.[1] Neither defendant had consented to the officers' entry, nor had it been approved by the trial judge. The officers had taken a video machine into the jury room so that a videotape of witness McKnight's interrogation could be replayed to the jury.[2] Detective Jacobs was the investigating officer on the case, had assisted during the trial with witnesses and exhibits, and had sat at the prosecution table during portions of the trial. Officer Bumpus had set up and played the videotape in question during trial. He was otherwise not involved in the case.

No one accompanied the officers as they entered the jury room. As soon as it was known that the officers had entered the jury room, the judge and co-defense counsel questioned them under oath. Neither Lee nor his counsel were in the courtroom. Officer Jacobs testified that he had had no conversation with the jurors, and that he simply brought the machine into the jury room with Officer Bumpus, and then departed. Officer Bumpus testified that a juror had asked him how often the police had to repair their video machine. The questions and answers on this point were as follows:

> THE COURT: All right. Was there any communication of any type to the jury back there, Officer Bumpus?
>
> OFFICER BUMPUS: Yes, Your Honor.
>
> THE COURT: What was that?
>
> OFFICER BUMPUS: One of the male jurors asked me how often we repair the machine. I stated we didn't. He told me his was in the shop being repaired.
>
> THE COURT: Anything else?
>
> OFFICER JACOBS: No conversation.
>
> THE COURT: All right. Do you want to ask them any questions?
>
> MS. CUNNINGHAM [CO–DEFENSE COUNSEL]: Did you even say good morning?
>
> OFFICER BUMPUS: No, ma'am.
>
> MS. CUNNINGHAM: Was there any conversation during (sic) showing the tape?
>
> OFFICER BUMPUS: No, ma'am.

The judge took no corrective action. The jury found Lee guilty of conspiracy to com-

---

* Honorable John W. Sedwick, United States District Judge for the District of Alaska, sitting by designation.

1. It is unclear precisely who directed the officers to enter the jury room. Officer Jacobs testified

before the district court that "[it] most likely was the district attorney."

2. Defendant does not advance the replay of the tape itself as a basis for relief.

mit murder; it failed to reach a verdict on the murder charge. Lee was sentenced to serve 27 years to life in state prison. The California Court of Appeal affirmed the judgment. Lee's petition for writ of *habeas corpus* in the California Supreme Court was denied.

Lee then filed a petition for writ of *habeas corpus* in the U.S. District Court for the Central District of California. The district court held an evidentiary hearing at which Detective Jacobs and Juror Dorothy McAlfrey testified. Juror McAlfrey testified that neither the jury nor the officers discussed the case during the officers' presence in the jury room.[3] Finding the unauthorized presence of the officers to be a structural defect, the district court issued Lee's writ for *habeas corpus*.

## II.

■ A district court's grant or denial of a petition for writ of *habeas corpus* is reviewed *de novo*. *Sanders v. Ratelle*, 21 F.3d 1446, 1451 (9th Cir.1994); *Adams v. Peterson*, 968 F.2d 835, 843 (9th Cir.1992) (en banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 1818, 123 L.Ed.2d 448 (1993); *Thomas v. Brewer*, 923 F.2d 1361, 1364 (9th Cir.1991). "To the extent it is necessary to review findings of fact, the clearly erroneous standard applies." *Thomas*, 923 F.2d at 1364.

■ Constitutional errors occurring during a criminal proceeding generally fall into one of two categories: "structural defects in the constitution of the trial mechanism" and "trial errors." *Arizona v. Fulminante*, 499 U.S. 279, 280, 111 S.Ct. 1246, 1249, 113 L.Ed.2d 302 (1991); *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993). Because structural defects "infect the entire trial process," they are not subject to the harmless error analysis

and their existence requires automatic reversal of conviction. *Brecht*, —— U.S. at ——, 113 S.Ct. at 1717.

■ A trial error, on the other hand, is not per se fatal—rather, it is scrutinized on direct appeal under "harmless error" analysis. Where, as here, the error is challenged collaterally, the error will be found harmless unless it is shown that the error had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, —— U.S. at ——, 113 S.Ct. at 1714; *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). Under the *Brecht* "harmless error" standard, relief must be denied unless the *habeas* petitioner can show that the error caused actual prejudice. *Id.* —— U.S. at ——, 113 S.Ct. at 1722.[4]

## III.

■ That the unauthorized entry into the jury room was an error cannot be debated. But, to hold that the officers' intrusion so infected the entire trial process as to defy harmless error analysis would be to disregard Supreme Court authority to the contrary. The Court in *United States v. Olano*, —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), held that, except in the rare egregious case, an intrusion into the jury's deliberation must be analyzed for its prejudicial impact on the jury's verdict, and, absent such showing, automatic reversal cannot result. *See also United States v. McFarland*, 34 F.3d 1508 (9th Cir.1994) (the substitution of an alternate juror after the jury has already retired is not inherently prejudicial, and does not affect the defendant's substantial rights).

The Court's review of "intrusion" jurisprudence in *Olano* demonstrates that intrusion should normally be analyzed for its prejudi-

---

**3.** When asked, Juror McAlfrey responded that nothing improper had happened while Bumpus and Jacobs were in the jury room, and said that no juror discussed the case with the officers. Not surprisingly, her testimony revealed that she recalled little of the event which had occurred some eleven years earlier.

**4.** The Court in *Brecht* further recognized a hybrid constitutional error, where "a deliberate

and especially egregious [trial error] ... might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." *Brecht*, —— U.S. at ——, 113 S.Ct. at 1722, n. 9; *Hardnett v. Marshall*, 25 F.3d 875, 879 (9th Cir. 1994) (key consideration in "hybrid" error analysis is "whether the integrity of the proceeding was so infected that the entire trial was unfair").

cial impact upon the deliberations. *Olano*, —— U.S. at ——, 113 S.Ct. at 1780. Though recognizing there may be instances where an intrusion warrants presumptive prejudice, the mere presence of alternate jurors during jury deliberations is not one of them. "We cannot imagine why egregious comments by a bailiff to a juror ... or an apparent bribe followed by an official investigation ... should be evaluated in terms of 'prejudice,' while the mere *presence* of alternate jurors during jury deliberations should not." *Id.* (italics in original). But even so, the Court emphasized that the inquiry is always the same: Whether the intrusion affected "the jury's deliberations and thereby its verdict." *Id.*

We recognize that *Olano* was a "plain error" case, but see no reason to depart from the Court's explication of intrusion jurisprudence because the attack here is collateral. *Olano* held that to show a plain error affected "substantial rights," a defendant generally must make a specific showing of prejudice. *Id.* at ——, 113 S.Ct. at 1778.

■ Here, we find no hint of prejudice. The testimony officers Bumpus and Jacobs gave upon exiting the jury room revealed that their entry was innocuous, not prejudicial.[5] The record clearly shows there was no improper influence on the jury; much less that the officers' presence had a substantial and injurious effect or influence in determining the jury's verdict.

REVERSED.

---

**5.** Although we recognize the substantial *potential* for prejudice from the presence of police officers in the jury room, much more so than from the presence of alternate jurors, we conclude that the critical issue is nonetheless whether there was *actual* prejudicial impact upon the deliberations.