116 F.3d 487
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Isodoro "Teddy" MATRANGA, Thomas Ferguson and Larry Joseph
Hake, Defendants-Appellants.
 Nos. 95-50311, 95-50384, 95-50327, 95-50436, 95-50362.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted September 18, 1996.
Decided June 11, 1997.
 
 1
 Appeal from the United States District Court for the Southern District of California, Nos. CR-93-00384-2-LCN, CR-93-00384-4-LCN and CR-93-00384-8-LCN; Leland C. Nielsen, Senior District Judge, Presiding.
 
 
 2
 Before: KOZINSKI and LEAVY, Circuit Judges, and SCHWARZER,** District Judge.
 
 
 3
 MEMORANDUM*
 
 
 4
 Thomas Ferguson ("Ferguson"), Larry J. Hake ("Hake"), and Isodoro "Teddy" Matranga ("Matranga"), appeal from their convictions on multiple counts of a 56-count indictment for their involvement in an "advance fee" venture capital scheme to defraud. Ferguson and Hake also appeal from their sentences under the Sentencing Guidelines. The Government cross-appeals the district court's 60 month downward departure on Ferguson's sentence and appeals from the grant of Matranga's motion for acquittal on various counts. We affirm in part, reverse in part and remand for resentencing of each defendant.
 
 1. Ferguson
 
 5
 Ferguson was convicted on Count 1 (Conspiracy, 8 U.S.C. § 371); Counts 2-10 (Mail Fraud, Aiding and Abetting, 18 U.S.C. § 1341 and 2); Counts 11-17, 20, 21 (Wire Fraud, Aiding and Abetting, 18 U.S.C. § 1343 and 2); Counts 23, 24, 28-33, 35-37, 41 (Laundering of Monetary Instruments, 18 U.S.C. § 1956(a)(1)(A)(i) and 2); and Counts 42-49, 54 and 55 (Engaging in Monetary Transactions with Proceeds of Specified Unlawful Activity).
 
 
 6
 Ferguson argues that: (a) the district court violated Fed.R.Crim.P. 30; (b) the district court erred by presenting hand-edited instructions to the jury; (c) his conviction on Counts 46 and 47 must be reversed because the conduct proved does not constitute a crime; (d) there was a lack of evidence to support his conviction on conspiracy; (e) his convictions on money laundering are not supported by the evidence; (f) the district court erred in refusing to give his requested instruction on withdrawal; (g) the district court's enhancement of his sentence and the restitution order based on $867,000 in losses was not established by a preponderance of the evidence; (h) the court erred in adjusting his sentence upward for obstruction of justice; and (i) the district court erred in denying a downward departure for extraordinary circumstances. No. 95-50362.
 
 
 7
 (a) Rule 30 Violation
 
 
 8
 Fed.R.Crim.P. 30 provides in relevant part:
 
 
 9
 At the close of evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests.... The court shall inform counsel of its proposed action upon the request prior to their arguments to the jury.
 
 
 10
 The following exchange occurred between the court and Ferguson's attorney prior to closing argument:
 
 
 11
 MS. RAPPORT: The other matter, your honor--and I'm assuming that Mr. Ferguson's case is done and we're going to be moving very quickly into closing. I want to know if the court is going--
 
 
 12
 THE COURT: I don't know if we're moving quickly or not.
 
 
 13
 MS. RAPPORT: Oh. Well, are we going to have a time to have an out-of-the-jury discussion before we close?
 
 
 14
 THE COURT: About what?
 
 
 15
 MS. RAPPORT: About--well, for one thing, jury instructions.
 
 
 16
 THE COURT: I thought we went over the instructions the other day. I proposed to cover most of these that you have submitted.
 
 
 17
 MS. RAPPORT: Okay. Well, that was one point, because I wanted to be able to make reference to it in closing.
 
 
 18
 THE COURT: They won't be covered in the exact words, but they'll be substantially covered.
 
 
 19
 MS. RAPPORT: Is the court going to allow us to use a good faith instruction? I guess--
 
 
 20
 THE COURT: I don't want you reading any instructions.
 
 
 21
 MS. RAPPORT: All right. I'll just argue the gist of them.
 
 
 22
 THE COURT: That's right.
 
 
 23
 RT at 1579-80.
 
 
 24
 Ferguson argues that the district court erred by failing to inform counsel prior to argument of the specific instructions which would be given. We have stated: "[Rule] 30 provides that the district court must inform counsel whether it will give his proposed instructions to the jury prior to his closing arguments." United States v. Foppe, 993 F.2d 1444, 1451 (9th Cir.1993) (emphasis added). We explained that "[t]he object of [Rule 30] is to require the district court to inform the trial lawyers in a fair way what the instructions are going to be in order to allow counsel the opportunity to argue the case intelligently to the jury." Id. at 1452 (emphasis added; citation omitted).
 
 
 25
 Ferguson asserts in a conclusory manner that his argument was affected because he did not know the exact instructions which would be given, and that he could not tailor his arguments to the instructions. However, he has failed to show any harm. Failure to comply with Rule 30 constitutes reversible error only if closing argument was prejudicially affected thereby. United States v. Gaskins, 849 F.2d 454, 458 (9th Cir.1988).
 
 
 26
 The error was harmless. The court indicated that it was going to give substantially all of the instructions requested, and Ferguson's counsel acquiesced. We have stated that: "Prejudice in this context can be found only if a party was unfairly prevented from arguing his or her defense to the jury or was substantially misled in formulating and presenting argument." Id. Ferguson points to nothing showing he was prevented from making any reasonable argument to the jury.
 
 
 27
 After argument, the following exchange occurred between the court and counsel:
 
 
 28
 MS. RAPPORT: The other point we need to clarify--and actually I suspect the government may be concerned about this as well--the state of the jury instructions.
 
 
 29
 My understanding under Rule 30 is that we need an opportunity to talk specifically and make specific objections, not just with respect to the government's suggested instructions, but with respect to what the court intends to do with ours. I also needed to be able to use--
 
 
 30
 THE COURT: I told you what I was going to do with yours. I said I wasn't going to cover them, not in your language, but that they would be covered.
 
 
 31
 MS. RAPPORT: Yes. Respectfully, Your Honor, that's very nice. It's just--well, two things.
 
 
 32
 One. That still doesn't leave me with an understanding of what language I could use in front of the jury and what specific instructions were going to be covered.
 
 
 33
 More importantly right now, or as importantly right now, I appreciate the court's confidence that its going to be covered, but we do need to know in what way. I mean, at this juncture I don't even know what the jury is going to be read.
 
 
 34
 I have had a number of trials. I've never been in a situation where I don't know what the jury is going to be told about all the instructions, and, you know, frankly, language differences can sometimes matter. And I want to able to participate, or at least allowed objections. And I have to--
 
 
 35
 THE COURT: You'll have a chance to lodge objections after I finish the instructions.
 
 
 36
 MS. RAPPORT: But at a point in time after they have been read to the jury at which point any objections I have would be irrelevant to the court.
 
 
 37
 THE COURT: No, not irrelevant.
 
 
 38
 MS. RAPPORT: But it would seem to me it would be better for me to make an objection--
 
 
 39
 THE COURT: Well, it may have been better, but that's not the way it's going to be done.
 
 
 40
 MR. POKORNY [Hake's counsel]: Your Honor, may I join in that, in Miss Rapport's objection. I respect [sic] Your Honor has had a number of trials in front of the court. However, it is a little unusual logistically, the expression of unringing the bell was never truly here.
 
 
 41
 Your Honor has his own intentions as far as what's going to be read and what language, and we don't have a chance to really know what that is. It's too late once the jury has heard it.
 
 
 42
 THE COURT: All right. It will be too late then, won't it.
 
 
 43
 RT 1792-94.
 
 
 44
 Ferguson's attorney asked that she be told what instructions would be given and for an opportunity to object prior to the court's reading of them to the jury. The district court refused but indicated that it would allow objection after they were read. Ferguson was free to object to any instruction after it was given and before the jury began deliberations.
 
 
 45
 After the jury had been instructed, defendants again noted what they claimed was a Rule 30 violation. The court asked counsel whether they had any other objections. Ferguson's attorney objected only to the court's failure to give his requested instruction on withdrawal discussed below at 1(f). RT at 1819-23. Ferguson was not prevented from challenging any instruction, and in hindsight, it is clear that he adequately preserved the jury instruction issue he now raises on appeal. (See (f) below).
 
 
 46
 (b) Hand-Edited Jury Instructions
 
 
 47
 Ferguson argues that the district court erred in giving copies of the instructions to the jury which contained a number of hand-written marks and edits. Ferguson analogizes the impact of such edits to presenting extraneous material to the jury or ex parte judicial communications. Fed.R.Crim.P. 43; United States v. Throckmorton, 87 F.3d 1069, 1073 (9th Cir.1996); United States v. Matta-Ballesteros, 71 F.3d 754, 765-66 (9th Cir.1995).
 
 
 48
 Our review of the instructions with the marks and edits convinces us that the error was harmless. Only nine of the thirty-four pages of jury instructions show edits, and the extent of the edits is minor. The strikeouts and additions contain "no editorial comment" and are not evidentiary in character. Nothing in the "strikeouts" or minimal handwritten additions related to the guilt or innocence of the defendants. See United States v. Harber, 53 F.3d 236, 241 (9th Cir.1995). The impact, if any, on the verdict was negligible.
 
 
 49
 (c) Counts 46 and 47
 
 
 50
 Ferguson argues that his convictions on Counts 46 and 47 must be reversed because they are "facially insufficient."
 
 
 51
 Title 18 U.S.C § 1957(a) prohibits transactions involving proceeds of unlawful activity involving amounts "greater than $10,000." In the prelude to Counts 46 and 47, the indictment states that: "[Ferguson] did knowingly engage and attempt to engage in monetary transactions affecting interstate commerce, in criminally derived property of a value greater than $10,000[.]"
 
 
 52
 But in charging Counts 46 and 47, the indictment alleges:
 
 
 53
 Count 46: March 18, 1991, Certified check ... in the amount of $10,000 issued by Security Pacific National Bank, Brea, California, deposited into D & R Escrow Account ... at First National Bank in La Jolla, California.
 
 
 54
 Count 47: March 19, 1991, Check No. 1008, written on the D & R Escrow, First National Bank Account ... in the amount of $10,000 deposited into Palm Financial Account ... First National Bank, La Jolla, California.
 
 
 55
 In spite of the government's efforts, it cannot make $10,000 have a value greater than $10,000 by simply saying so. The specific allegations in Counts 46 and 47 fail to state a crime as defined in § 1957(a). Ferguson is correct that his convictions on Counts 46 and 47 must be reversed.[1]
 
 
 56
 (d) Sufficiency of the Evidence on Conspiracy (Count I)
 
 
 57
 Ferguson contends that the evidence, if anything, establishes the existence of two conspiracies, one involving Tony Conti ("Conti") and a separate conspiracy in which Ferguson was involved. Ferguson asserts that his and Conti's animosity for one another and the actions they took to work apart from each other disproves the existence of a single conspiracy.
 
 
 58
 It was not necessary for Ferguson and Conti to work together or to get along with one another in order to participate in a single conspiracy. The evidence shows that the center of the conspiracy was Sheldon Woods. Ferguson resigned from Golden Sun after Conti's arrival because of what Ferguson claims was their inability to work together. Ferguson founded Independent Loan and continued working on various loan packages. Evidence of his continued participation in the scheme to defraud, including further work relating to loan packages initiated during his time at Golden Sun, is sufficient to establish his participation in a single conspiracy, even though he and Conti chose to work apart.
 
 
 59
 (e) Money Laundering Convictions
 
 
 60
 Ferguson argues that his conviction on twelve counts of violation of 18 U.S.C. § 1956(a)(1)(A)(i)[2] must be reversed because the predicate acts of "mere negotiation of checks representing proceeds of fraud does not constitute money laundering under the statute." Ferguson contends that the funds were spent to maintain life-style and thus did not constitute money laundering.
 
 
 61
 In order to satisfy the requirements of 18 U.S.C. § 1956(a)(1)(A)(i)
 
 
 62
 ... the evidence must establish that the defendant conducted a financial transaction which involved the proceeds of unlawful activity, that he knew that the property involved was proceeds of some form of specified unlawful activity, and that he .... "intend[ed] to promote the carrying on of specified unlawful activity."
 
 
 63
 United States v. Montoya, 945 F.2d 1068, 1076 (9th Cir.1991) (internal quotations omitted).
 
 
 64
 The government presented sufficient evidence to convict Ferguson of the crimes charged in Counts 23, 31, 33, 37, and 41.[3] Each transaction was a deposit made to the account of one of the business entities involved in the scheme to defraud. Because funds from these accounts were used to further illegal activity, the evidence supports the verdict that these transactions violated § 1956.
 
 
 65
 The evidence does not support Ferguson's convictions on Counts 24, 28, 29, 30, 32, 35, and 36.[4] In each instance funds were deposited to a personal bank account or cash was obtained with no evidence of what was done with the funds. The evidence does not show that these transactions were carried out with the intent to promote or carry on any unlawful activity.
 
 
 66
 (f) Requested Jury Instruction on Withdrawal
 
 
 67
 Although the district court gave a withdrawal instruction as to the conspiracy, Ferguson contends that the court erred by failing to give his requested withdrawal instruction relating to the mail and wire fraud counts.
 
 
 68
 We disagree. There is evidence that even after Ferguson claims to have abandoned his illegal activity, he was still working on loan packages with codefendants. Furthermore, counts relating to events occurring after Ferguson claims he withdrew relate to victims with whom he had personal dealings. Just as the evidence supports Ferguson's conspiracy conviction based on his continuing involvement in the scheme to defraud, the denial of his requested withdrawal instruction as to the mail and wire fraud counts was not erroneous.
 
 
 69
 (q) Base Offense Level and Restitution Order
 
 
 70
 Victim "losses" in the amount of $867,565 were listed in an addendum to the Presentence Report, and represented the combined losses of 59 individuals asserted to have been defrauded. Ferguson challenged this amount in his objections to the presentence report. RT at 1865.
 
 
 71
 Without any specific finding, the district court accepted the amounts given in the Presentence Report and calculated Ferguson's base offense level by attributing to him $867,565 in victim losses. The district court's reliance on this figure for sentencing was erroneous because the government failed to connect most of the specific losses to the conduct of the defendants. Much of this loss is based on amounts for which no testimony was given at trial.
 
 
 72
 The government maintains that this information is reliable because the information was gathered from "various reports, the investigating agent, and the Government." This background information, however, is not in the record. We conclude that the government failed to establish any losses other than those testified to at trial. See United States v. Burnett, 16 F.3d 358, 361 (9th Cir.1990).
 
 
 73
 It follows that the district court's restitution order in the amount of $867,565 must also be vacated.
 
 
 74
 (h) Upward Adjustment for Obstruction of Justice
 
 
 75
 Ferguson contends that the district court erred by enhancing his sentence for obstruction of justice by knowingly giving false testimony.
 
 
 76
 Ferguson testified at length at trial that he had no knowledge of the fraudulent activity occurring in his office. The district court did not believe Ferguson's testimony and stated: "It's inconceivable to me ... that with his background and ability that he wouldn't recognize that this was just a scam ... and testifying to the contrary didn't go over with the jury and it didn't go over with the court." The court made a specific finding that Ferguson's testimony was willful. RT 1870.
 
 
 77
 If the court finds that a defendant's trial testimony was false, material, and willful, then the obstruction of justice enhancement under U.S.S.G. § 3C1.1 applies. The Presentence Report recommended the enhancement for obstruction of justice based on Ferguson's denial of the factual elements of the offense. Ferguson presented his objections to the district court prior to sentencing.
 
 
 78
 We conclude that the court's statement satisfies the requirement of United States v. Dunnigan, 113 S.Ct. 1111, 1116 (1993), that the court articulate specific findings in support of the conclusion that the defendant has given "false testimony concerning a material matter with the willful intent to provide false testimony." We see no error in the enhancement for obstruction of justice.
 
 
 79
 (i) Denial of Downward Departure on Family Circumstances
 
 
 80
 Although the district court expressed some doubt about its authority to depart downward based on extraordinary family circumstances, Ferguson concedes that the court explicitly stated that it was not denying the downward departure because it believed it lacked such authority. ER 712. Accordingly, we lack jurisdiction to review a district court's discretionary decision not to depart downward. United States v. Eyler, 67 F.3d 1386, 1390 n. 5 (9th Cir.1995).
 
 
 81
 On cross-appeal, No. 95-50384, the government argues that the district court erred by departing downward 60 months from the lower end of the Guidelines' range. Ferguson's Guidelines range was 97-121 months, and the court sentenced him to 37 months.
 
 
 82
 The government asserts that the district court erred by its reliance on proposed changes in the Sentencing Guidelines which never came into effect; its disapproval of the government's charging of money laundering in this case; and because the case against the primary figure, Sheldon Woods, was dismissed on a double jeopardy plea due to a prior criminal forfeiture.
 
 
 83
 The district court appears to have granted the departure in large part because it disagreed with the treatment of other defendants and with the Guideline's treatment of "reinvestment" money laundering. These considerations, however, do not present unusual circumstances which have not been considered by the Sentencing Commission. A district court's decision to depart downward from the Guidelines is reviewed under the abuse of discretion standard. Koon v. United States, 116 S.Ct. 2034 (June 13, 1996). We conclude that the district court abused its discretion.
 
 
 84
 We AFFIRM Ferguson's convictions on Counts 1, 2-10, 11-17, 20, 21, 23, 31, 33, 37, 41, 42-45, 48-49, 54, 55; REVERSE his convictions on 24, 28-30, 32, 35, 36, 46, 47; VACATE the sentence and restitution order and REMAND for resentencing.
 
 2. Hake
 
 85
 Hake was convicted on Count 1 (Conspiracy in violation of 18 U.S.C. § 371); Counts 5, 6, and 10 (Aiding and Abetting Mail Fraud, 18 U.S.C. §§ 1341 and 2); Counts 11, 12, and 13 (Aiding and Abetting Wire Fraud, 18 U.S.C. §§ 1342 and 2); and Counts 46 and 47 (Engaging in Monetary Transactions with Proceeds of Specific Unlawful Activity, 18 U.S.C. § 1957).
 
 
 86
 Hake argues that: (a) the district court violated Fed.R.Crim.P. 30; (b) the district court erred by providing copies of hand-edited instructions to the jury; (c) his conviction on Counts 46 and 47 must be reversed; (d) his conviction on Count 1, conspiracy, must be reversed because it was not supported by sufficient evidence, or in the alternative, because his convictions on Counts 46 and 47 must be reversed; and (e) the district court erred by enhancing his offense level and ordering restitution based on losses in the amount of $867,565. No. 95-50436.
 
 
 87
 (a) and (b) Rule 30 and Jury Instructions
 
 
 88
 Hake presents arguments similar to Ferguson's concerning the district court's violation of Rule 30 and its presentation of hand-edited instructions to the jury. We reject his arguments for the reasons set forth in Ferguson's appeal. (Part 1(a)-(b) above). The errors were harmless.
 
 
 89
 (c) Counts 46 and 47
 
 
 90
 Hake's convictions on Counts 46 and 47 (18 U.S.C. § 1957--Engaging in Monetary Transactions with Proceeds of Specified Unlawful Activity) must be reversed for the reasons stated in part 1(c) above, dealing with Ferguson's convictions on Counts 46 and 47.
 
 
 91
 (d) The Conspiracy Conviction
 
 
 92
 Hake argues that his conviction on the conspiracy charge was not supported by sufficient evidence. We disagree.
 
 
 93
 Hake was convicted on substantive Counts 5, 6, and 10-13 (specific mail and wire transactions) relating to victims he had personally attracted to the scheme. Hake had a personal and professional relationship with Sheldon Woods dating back to 1987. Between 1990 and 1991, Hake referred at least five clients to Sheldon Woods and none of these projects were funded. The Government also introduced evidence that for the same period Woods (through Palm Financial) paid Hake more than $300,000 in "commissions."
 
 
 94
 The nature of the scheme, the common identity of the Palm Financial, D & R Escrow and Golden Sun participants, and the contacts between Hake and other members of the conspiracy, especially with respect to the principals Woods and Ferguson, sufficed to allow a jury to find that Hake was involved in a single eight-member conspiracy. United States v. Lorenzo, 995 F.2d 1448, 1458 (9th Cir.1993) (every member of a conspiracy need not know every other member or be aware of all acts committed in connection with conspiracy); United States v. Lulan, 936 F.2d 406, 411 (9th Cir.1991) (a single conspiracy may involve several subagreements or subgroups of conspirators).
 
 
 95
 Hake argues that because Counts 46 and 47 must be reversed, his conspiracy conviction must be reversed as well. Citing United States v. Manarite, 44 F.3d 1407, 1413 (9th Cir.1995), Hake argues that it is unknown whether the jury found him guilty of conspiracy to commit the acts charged in Counts 46 and 47 or one of the other unlawful objects charged in the indictment.[5]
 
 In Manarite, we stated:
 
 96
 In finding [the defendants] guilty of conspiracy, the jury used a general verdict form, which gave no indication of which object or objects formed the basis of their decision.
 
 
 97
 ... [T]he conspiracy conviction cannot stand: "[I]f the judge instructs the jury that it need find only one of the multiple objects, and the reviewing court holds any of the supporting counts legally insufficient, the conspiracy count also fails." The problem "springs from the combined effect of the composite conspiracy count, the one-is-enough jury charge, and the failure of one of the substantive crime counts[.]"
 
 
 98
 Id. at 1413 (citations omitted).
 
 The jury was instructed that
 
 99
 [t]he defendants are charged in Count 1 of the indictment with conspiring to commit Mail Fraud, Wire Fraud, Laundering of Monetary Instruments, and (Conducting Financial Transactions in Proceeds of Specified Unlawful Activity) in violation of Section 371 of Title 18 of the United States Code. In order for the defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt: ... [T]here was an agreement between two or more persons to commit at least one crime as charged in the indictment;.... Each defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it....
 
 
 100
 RT 1805-6. Hake argues that because all of his convictions of "conducting financial transactions in proceeds of specified unlawful activity" must be reversed, the jury may have erroneously convicted him of conspiracy only to commit that crime.
 
 
 101
 We disagree. Manarite does not control because in that case the convictions of all defendants were reversed on two of the five alleged objects of the conspiracy. Every count underlying those two objects was legally insufficient. 44 F.3d at 1411-14. In the instant appeal, however, there were valid § 1957 counts charged against the other defendants, i.e., Counts 42-45 and 48-55, and convictions on those counts.
 
 
 102
 Other evidence supports a finding of Hake's participation in the scheme, and given the convictions of other defendants for conducting financial transactions with proceeds of specified unlawful activity and for all of the other objects of the conspiracy, sufficient evidence supports Hake's conspiracy conviction. The failure of the jury to convict Hake on any of the other § 1957 as a coconspirator may be regarded merely as jury error, compromise, or lenity, and does not require reversal. United States v. Powell, 469 U.S. 57, 65 (1984); United States v. Hughes Aircraft Co., Inc., 20 F.3d 974, 977-78 (9th Cir.), cert. denied, 115 S.Ct. 482 (1994).
 
 
 103
 (e) Sentencinq
 
 
 104
 The district court's calculation of Hake's base offense level and the restitution order must be reversed for the reasons stated in Ferguson's appeal. (Part 1(g) above).
 
 
 105
 We AFFIRM Hake's convictions on Counts 1, 5, 6, 10-13; REVERSE his convictions on Counts 46 and 47; VACATE the sentence and restitution order and REMAND for resentencing.
 
 3. Matranga
 
 106
 Matranga was convicted on Count 1 (Conspiracy, 18 U.S.C. § 371); Counts 2 and 9 (Mail Fraud, Aiding and Abetting, 18 U.S.C. § 1341 and 2); and Count 14 (Wire Fraud, Aiding and Abetting, 18 U.S.C. § 1343 and 2). Although the jury found Matranga guilty on Counts 23, 24, and 30 (Laundering of Money Instruments, 18 U.S.C. § 1956(a)(1)(A)(i)), the district court granted Matranga's motion for acquittal on these three counts pursuant to Fed.R.Crim.P. 29(c).
 
 
 107
 The government appeals from the district court's grant of Matranga's motion for acquittal on Counts 23, 24, and 30. No. 95-50311.
 
 
 108
 In accord with our discussion in Ferguson's appeal, part 1(e) above, concerning the elements required for conviction under § 1956(a)(1)(A)(i), the order granting Matranga's acquittal on Counts 24 and 30 should be affirmed.[6] Neither transaction evidences an effort to promote or carry on any specific unlawful activity. The order granting acquittal on Count 23, however, was erroneous.[7] Deposit of the funds into Palm Financial's account aided in the promotion of the scheme to defraud.
 
 
 109
 In his cross-appeal Matranga challenges the district court's denial of his motion for severance and the sufficiency of the evidence for his convictions for conspiracy (Count 1), mail fraud (Counts 2 and 9), and wire fraud (Count 14). No. 95-50327.
 
 
 110
 Evidence supported the allegations that Matranga was involved in the scheme to defraud and was personally instrumental in transactions regarding victims Mark Smith and Marvin Gelbart. This evidence overlapped with that supporting the counts alleged against Matranga's codefendants. In these circumstances, joint indictment and trial of Matranga and the other codefendants was proper. See United States v. Marcello, 731 F.2d 1354, 1360 (9th Cir.1984). The district court did not abuse its discretion in denying severance.
 
 
 111
 We find no merit to Matranga's challenge to his conviction on Counts 1, 2, and 9 based on a lack of evidence. Matranga had been involved in Golden West Capital from its earliest days, and later founded and acted through his own business Investor's Funding. He was personally involved with and instrumental in the introduction of Ruggirello, Ferguson, and Woods to each other. Evidence of Matranga's involvement in the mail and wire transactions concerning Marvin Gelbart and Mark Smith was sufficient to establish beyond a reasonable doubt that Matranga was a coconspirator in a joint scheme to defraud, and that he personally committed or aided and abetted in the mail and wire fraud. The fact that he had a legitimate full time job does not detract from the other evidence. The convictions were supported by sufficient evidence.
 
 
 112
 We REVERSE the grant of acquittal on Count 23; AFFIRM the convictions on Counts 1, 2, 9, 14, and 23; VACATE Matranga's sentence and REMAND for resentencing.
 
 
 113
 In No. 95-50311, the government's appeal, we AFFIRM the grant of acquittal on Counts 24 and 30, and REVERSE the grant of acquittal on Count 23; in No. 95-50327, Matranga's cross-appeal, we AFFIRM his convictions on Counts 1, 2, 9, 14. We VACATE Matranga's sentence and REMAND for resentencing.
 
 
 114
 In No. 95-50436, Hake's appeal, we AFFIRM Hake's convictions on Counts 1, 5, 6, 10-13; REVERSE his convictions on Counts 46 and 47; VACATE the sentence and restitution order and REMAND for resentencing.
 
 
 115
 In No. 95-50362, Ferguson's appeal, we AFFIRM Ferguson's convictions on Counts 1, 2-10, 11-17, 20, 21, 23, 31, 33, 37, 41, 42-45, 48-49, 54, 55, and REVERSE his convictions on 24, 28-30, 32, 35, 36, 46, and 47. In No. 95-50384, the government's crossappeal, we REVERSE the 60 month downward departure based on extraordinary circumstances. We VACATE the sentence and restitution order and REMAND for resentencing.
 
 
 116
 KOZINSKI, Circuit Judge, dissenting in part.
 
 
 117
 I do not agree there was insufficient evidence to support Ferguson's money laundering convictions on Counts 24, 28-30, 32 and 35-36, and Matranga's convictions on Counts 24 and 30.
 
 
 118
 These counts all represent payments from the conspirators' shell corporations to various participants in the scheme. My colleagues believe there is no evidence Ferguson and Matranga reinvested these payments in the conspiracy. But such evidence is not necessary to convict defendants of money laundering under 18 U.S.C. § 1956(a)(1)(A)(i). Payments of illegally obtained funds to conspirators by definition "promote the carrying on" of the conspiracy, because without them, no one would have an incentive to participate. They are like salaries offered to employees--payment for services rendered.
 
 
 119
 These payments thus stand in sharp contrast with transactions one step downstream, where happily paid conspirators use funds obtained from shell corporations to satisfy personal obligations. The majority's conclusion that "these transactions were not carried out with the intent to promote ... any unlawful activity," Memorandum at 11, would be correct if the government had charged Ferguson and Matranga with spending money paid to them by the front corporations on cars, vacations or other personal items. See United States v. Torres, 53 F.3d 1129, 1138 (10th Cir.) (purchase of car with drug proceeds not money laundering where car was not used in trafficking), cert. denied, 115 S.Ct. 2599 (1995); United States v. Heaps, 39 F.3d 479, 486 (4th Cir.1994) (payment of private debt with drug proceeds not money laundering). But the payments here were designed to reward the conspirators for their prior illegal activities and secure their continued allegiance to the scheme. Because the money laundering statute punishes payments that reward or promote underlying unlawful activities, see United States v. Montoya, 945 F.2d 1068, 1076 (9th Cir.1991) (deposit of check obtained through bribery is money laundering where necessary for defendant to see any gain from the crime), defendants' conduct falls squarely within section 1956(a)(1)(A)(i)'s prohibition. Ferguson's money laundering convictions should be affirmed and Matranga's judgments of acquittal reversed.
 
 
 
 **
 The Honorable William W. Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The jury was instructed that in order to prove a violation of § 1957, the government must establish all of the following elements beyond a reasonable doubt: "First, that the defendant engaged in a monetary transaction in criminally derived property of a value greater than $10,000."
 
 
 [2]
 This section imposes criminal penalties on "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--with the intent to promote the carrying on of specified unlawful activity."
 
 
 [3]
 Count 23: Check from D & R Escrow in the amount of $5,000 deposited to Palm Financial account, Nov. 6, 1990; Count 31: Check from Palm Financial in the amount of $6,666 deposited in Golden Sun Mortgage, March 22, 1991; Count 33: Check from D & R Escrow in the amount of $7,000 deposited in Palm Financial Account, Feb. 1, 1991; Count 37: Check from Palm Financial in the amount of $6,910 deposited into Golden Sun Mortgage account, May 16, 1991; Count 41: Check from Palm Financial account in the amount of $1,733, deposited into Golden Sun Mortgage account, June 13, 1991
 
 
 [4]
 Count 24 of the indictment alleges that a check was drawn on Palm Financial's Bank of America Account No. 11020-2336 in the amount of $2,300 and that this check was deposited into Teddy Matranga's personal bank account on Nov. 13, 1990. Trial Exhibit 271. These funds originated from victim Gelbart's escrow payment to D & R Escrow. D & R then paid the money to Palm Financial which in this case transferred the funds to to Matranga. There is no evidence concerning Matranga's use of these funds, nor is there evidence that his personal account was being used at this time for any unlawful activity
 Count 28 alleges that a check drawn on Golden Sun Mortgage First National Bank Account No. 12050-03002 in the amount $6,000 was cashed by Ferguson on March 19, 1991.
 Count 29 alleges that a check drawn on Golden Sun Mortgage's First National Bank Account No. 12050-03002 in the amount of $5,000 was cashed by Ruggirello on March 19, 1991.
 Count 30 alleges that a check drawn on D & R Escrow's Bank of America Account No. 11023-03235 in the amount of $7,000 payable to Palm Financial was cashed on Oct. 12, 1990.
 Count 35 alleges that a check drawn on Golden Sun Mortgage's Bank of America Account No. 11026-02050 in the amount of $8,000 was cashed by Ruggirello on April 30, 1991.
 Count 36 alleges that a check drawn on Golden Sun Mortgage's Bank of America Account No. 11026-02050 in the amount of $8,500 was cashed by Ruggirello, May 7, 1991.
 The record establishes that victim funds were originally deposited with D & R escrow, and only after that were funds transferred to Palm Financial and Golden Sun Mortgage from D & R. There is no evidence that Ferguson or Ruggirello used cash obtained by these transactions to carry on or promote the illegal activity, and none of these transactions were necessary for the conspiracy to gain control over the victims funds.
 Count 32 alleges that a check was drawn on Golden Sun Mortgage First National Bank Account No. 12050-03002 in the amount of $400 and payable to Carriann Kutchta. This check was deposited into Kutchta's First National Bank account on March 22 1991. The record does not show that these funds were used by Kutchta to further or carry on any unlawful activity.
 
 
 [5]
 Count 1 alleged conspiracy to defraud by use of the U.S. Postal Service in violation of 18 U.S.C. § 1341; by means of wire in violation of § 18 U.S.C. § 1343; and by engaging in financial transactions to further the mail and wire fraud in violation of 18 U.S.C. § 1956(a)(1)(A)(i)
 
 
 [6]
 Count 24: Check from Palm Financial in the amount of $2,300 deposited in Teddy Matranga's account, Nov. 13, 1990; Count 30: Check from D & R Escrow in the amount of $7,000 to Palm Financial, cashed, Oct. 12, 1990
 
 
 [7]
 Count 23: Check from D & R Escrow in the amount of $5,000 deposited into the Palm Financial account, Nov. 6, 1990